S.A. Palm Beach v. Certain Underwriters at Lloyd's. Good morning, Your Honor. Should we proceed? Yeah. So, yes. Mr. Lynn, before we get started, I don't know who is going to address any potential jurisdictional issue, but before the clock runs, I wanted to at least point out something about those jurisdictional questions because it seems like we've been, the court and counsel have been like ships passing in the night on this issue. We got the filing, the joint stipulation from counsel. One of the concerns, at least that I have, is whether an individual syndicate has, whether we have to know under what laws it has been organized and whether it has a principal place of business. I understand from one of the letters that was filed that there's a contention that if the syndicate has a single member, then it's a citizen of whatever jurisdiction that single member is from, but there's also a question that pertains to the Class Action Fairness Act, and the Class Action Fairness Act provides that an unincorporated association shall be deemed to be a citizen of the state, capital S, where it has its principal place of business, and the state, capital S, under whose laws it is organized, but if the syndicate is actually a citizen of a foreign state, not an American state, capital S, does this provision apply, and if not, what rule does apply to determine that jurisdictional question? I'm sorry about us having to continue to sort through this jurisdictional question, but this is what happens when we get diversity actions. We have to satisfy ourselves about jurisdiction, so I hope someone's going to talk about that. Maybe I just misunderstand what's going on here, but I hope that that's clear to you what my concern is. Your Honor, if I could, to your point before the clock runs, give you a sense of what we were planning, and maybe then you could let us know how you'd like us to proceed. Your Honor, I was going to speak first for seven minutes, then Mr. Taylor and then Mr. Barr, because there are three consolidated cases we all represent. The jurisdictional question is only in the essay palm question case, and Mr. Taylor was going to speak to that in his time, but if you'd like him to go ahead, we can rearrange. No, that's great. I know we've got Mr. Taylor to address that, and we'll deal with it then. Your Honor, may I just? Paul Fields, and I'm counsel for the underwriters, and I know if your Honor gets on the clock, if we start talking about Lloyd's, it might take up the whole 20 minutes, so I don't know how your Honor wanted to address that, if you wanted us to address it now off the clock from the appellees. I know, we've given y'all extra time today. I'm not worried too much about the clock, probably more time than we actually need in these cases, but we'll deal with this when Mr. Taylor's time comes, I think. Thank you, Your Honor. Mr. Lin. Thank you, Your Honor. Good morning, and may it please the court. My name is Albert Lin, and I'm here on behalf of Appellant RTG Furniture Corp, and in my time, I will seek to address at least the primary common issue for all of these cases, the meaning of direct physical loss of or damage to property, and then, Your Honor, as I mentioned, I will yield to my colleagues who represent the policyholders in the other cases. The main question is the meaning of the word physical in the phrase direct physical loss of property. We believe as a matter of plain meaning, and under Florida law, which governs here, the word physical does not necessarily require a tangible alteration of property, but instead can reasonably be read to cover circumstances where property has become functionally useless to the policyholder, and, Your Honor, we think there are at least two different ways of reading physical reasonably that get there, and both readings, we believe, have been acknowledged in either the other side's briefs here or in other cases, including by the Seventh Circuit. Yeah, see, I'm not sure about the premise here. It seems to me that the problem that you have is that this is a policy provision about direct physical loss of or damage to property, and I'm having a hard time seeing how that's what we have here. Of course, Your Honor. If I could say it for you, the two ways we think you can read physical that gets you to a situation where and it won't make a difference that it's preceded by the term direct and by the and and afterward we have the word loss. Don't we look at that entire phrase direct physical loss? Of course, Your Honor. I think for the I think the word loss in terms of loss of property is fairly broad on its face. If you take the words direct and physical out of it, loss includes things, of course, like dispossession, but it also includes things like degradation and devaluation and diminution, and I don't think there's any dispute that loss of property standing alone without the words direct and physical is actually a fairly broad phrase, so that's why I think the focus here is on the word physical. As to direct, Your Honor, that gets to the fact that the. Do we have any property here that had to be repaired, rebuilt, or replaced? Well, two answers to that, Your Honor. I think one, the question is what do those words mean, and they're undefined terms, and we think replace includes things like restoring something to its original state, but, Your Honor, if as I think is intimated by your you're reading those words more narrowly to require some kind of sort of hammer and nail rebuilding, right, or actually physically replacing the property, the other thing that's important about that. Well, I mean the property here might have required some cleaning, but the property, it seems to me, was the same before and after. Well, but that gets to the question, Your Honor, of what work physical is doing and what a direct physical loss is, if it includes situations where there's a loss of function to the policyholder, then I think the sort of the concept that just because there's cleaning alone that that's not really the right one. I think the way you need to think about this, Your Honor, respectfully is imagine a piece of property that's covered with anthrax, right? I'm not a scientist. I can't tell you exactly what goes into cleaning anthrax, but I think we could agree that generally what happens is you need to have a piece of property where it's just cleaning. The issue is whether the property loses its functionality absent the remediation, and the remediation there is the cleaning. And so, Your Honor, I know Mama Jo's states that there was only mere cleaning there, but one of the big differences between Mama Jo's and this situation is that there was no loss of functionality in that case. It says right at the beginning of the case that the restaurant did not lose its ability to serve the same number of customers. Practically, it didn't, but it didn't lose that ability. And our argument here is that this property, like something that's covered with anthrax, loses its functionality to the policyholder absent remediation, which is really the question. So I don't think the cleaning only test is either accurate or makes sense under the plain meaning of the words. Your best case, Mr. Lin, on that point is mass funds, right? It is not, Your Honor. Azalea, we believe, is our best case. Mass funds was relied on in Mama Jo's, but the language in mass funds is different from the language here. The policy language there said direct physical loss. It didn't say direct physical loss of or damage, and we think that that disjunctive or is important in the sense that it requires some non-overlapping situations. Didn't Azalea require, according to the court, that the substance that adhered to the interior of the facility had to be chiseled and steamed off? And doesn't chiseling suggest some physical alteration of the property? Your Honor, I don't quarrel with the facts there. I think the issue, Your Honor, is with the question whether it was required, and I don't think it was required. Azalea talks about Hughes and Western Fire when it articulates the principle of what direct physical loss means, and those are cases where there was no tangible alteration, where there was simply a physical cause or a situation where it was the practical equivalent of losing your property, which is what we have here. And Your Honor, Judge Jordan, in Azalea, the court talks about Hughes and Western Fire, and then it says the facts here are, quote, even more compelling, right? And then it points to, Your Honor, what you pointed to, which is the chiseling and the cleaning of the substance. So I can't and don't quarrel with the idea that there might have been something tangible that was involved in Azalea, but I don't think that was required. I think what the court there said was that was even more compelling. It was a bonus there that was beyond what was required in Hughes and Western Fire, which are the two cases that it relied on. Yeah, but the bacterial colony was an integrable part of the sewage treatment facility. That's true, Your Honor, and again, I don't... It was destroyed. I don't dispute the facts there. I think the question is, what is the legal principle that was required? And I don't think Azalea says that that was a required element of direct physical loss. It simply says the facts here are even more compelling. They said the colony was replaced, right? Your Honor, I see my time has expired, if I may answer. Sure. Chief, this is Judge Anderson. I have a question that is going to take, I think, a little time, but... That's fine. He was about to finish and answer to my question, I think. Right. We'll do that right away. Got you. Thank you, Your Honors. Judge Pryor, Chief Judge Pryor, to your question, that is what Azalea says, again, about the facts that were on the ground there. That is why there was a loss of function there, because there was this physical cause. And we, one, I don't think it was required, but two, we have pleaded a physical cause here. The physical cause being the presence of the coronavirus that we think has rendered our property non-functional. Judge Anderson. It seems to me that your temporary loss of use argument is flawed for the following reason. All of the policies here have this provision or the substance of it. I'm quoting it. The suspension of business must be caused by a direct physical loss of or damage to property. What you're arguing is that your temporary loss, i.e. suspension of business, is, in fact, the direct physical loss of or damage to property. In other words, but the policies all say that that suspension of business, that loss of use, has to itself be caused by a direct physical loss of or damage to property. In other words, you can't have it both the damages in effect, the loss of the suspension of business, and also the cause. How do you respond to that? Respectfully, Your Honor, I don't think that that's at least in our case what we're arguing. We are not arguing that it is the closure of the business that is the direct physical loss. The direct physical loss is the loss of functionality of our property, which in turn led to either a closure in business or simply our inability to use the property. Your Honor, for example, if we had tables in our facility and we have pleaded that those obviously have doors to our facility, we've pleaded that that property had coronavirus on it, and it was that physical presence that caused the loss of functionality of the property, which in turn results in some coverage, whether it's business interruption or extra expenses, but it is not the interruption itself that is the loss. It is the inability to use the property for its function to the policyholder. My time is long expired, Your Honor. That's okay. Judge Anderson, did you have any other questions? I think not. Thank you. Okay, Mr. Barr. Good morning, Your Honors. May it please the Court, my name is Chad Barr, and I along with Nick Chiapetta represent Emerald Coast Restaurants. Your Honors, we adopt Mr. Lin's arguments before me and Mr. Taylor's arguments after us. I just want to spend a few minutes discussing a few major differences between our that exist in the Aspen policy in this case. The first is that this policy provides for spoilage coverage, which we have alleged to claim for in our amended complaint. So the amended complaint alleged that Emerald Coast suffered spoilage of perishable product during the policy period, and that the policy provided for spoilage coverage. The issue in this case really comes down to what caused the spoilage of the perishable product. So the amended complaint alleged principally that the perishable product spoiled either because of the existence of the coronavirus in and on the premises and on the perishable product, or that the spoilage was the result of the government closure orders, either directly or indirectly. So the issue in this case really comes down to a question with respect to spoilage coverage, a question of causation, which we believe under both Florida law and federal law is not appropriate for a motion to dismiss. For the spoliation coverage, what does the policy say the cause has to be? Well, is it for any spoliation, no matter what the cause, or are there certain specific circumstances that trigger that spoliation coverage? Well, Judge Jordan, Aspen as the master of its own policy, wrote in both coverages and exclusions. So we can go right to the to the policy provision under spoilage and show that Aspen's argument is that it only is triggered in two specific circumstances, mechanical breakdown and power outage. Our position is that's patently incorrect because the policy says that the covered cause of loss includes, it used the words includes, which signifies that there are other causes of loss beyond just mechanical breakdown and power failure. So the argument that there's only two things that trigger it, there's no support for that in the policy. And it also has exclusions as well. So there's five exclusions listed in the policy, which avoids the argument that every time perishable product spoils, it's covered on the policy. So Aspen wrote the policy, Aspen has to be bound by the terms of the policy. And it's not limited to those two particular situations. And so we've got these other concerns that Aspen raised with regard to the exclusions, the Government Act exclusion. Your Honor, there's a ensuing loss provision in this policy, which requires Aspen to cover losses that result as a result of the exclusion of the Government Act exclusion. So we've got the ensuing loss provision in this case. We also have the fact that this policy covers intangible losses as well. So that's another distinguishing factor in this particular policy. So in this policy, the policy covers things like financial harm due to employee dishonesty. That's all an extension of the primary coverage provision in this case. So an employee dishonesty is not based strictly on damage to property. The policy also covers electronic data. So if data is damaged due to a computer virus or hacker, that also is not triggered by physical damage to or alteration of the property. So we've got one final question. The Florida's Third District Court of Appeal heard argument in a similar case involving a coverage dispute for COVID a week ago in a Is it your view that we should wait for the third DCA to rule before we take on the main coverage issues in this case? Or do we just go full steam ahead? Well, we've asked the court certify the question to the Florida Supreme Court because there is no guidance. I do believe this court would be bound by a third DCA opinion on that issue. So I do believe that the third DCA would be binding on this court if that opinion was was issued before this court ruled. Thank you. And I don't have any time left, but I will turn it over to Mr. Taylor. Thank you. Morning, your honor's Lindsay Taylor from Cora burn. We represent SA Palm Beach. To quickly answer your honor's question about jurisdiction. I don't believe the section relating to unincorporated entities or associations being a citizen of this a particular state because the Lloyd's corporation entity is a foreign entity. Okay, then what what's the rule? Well, the rule is for jurisdiction, subject matter jurisdiction under CAFA. All you need is one member of the class. So we have we have a we have a provision D 10. This specifically abrogates the ordinary rule for for unincorporated associations of states, American states. You agree with me? That's what it does? Yes. Okay. It doesn't speak to unincorporation, unincorporated associations from foreign states, right? Correct. So does that mean that we revert to the ordinary rule from precedent? Yes. And unincorporated association from a foreign jurisdiction is a resident of every place where every member it correct. And if you follow that rule, there's jurors, the jurisdiction, so long as there's one class member different from the citizenship of one, one defendant, if you drill back, yeah, do that one. To the one member of that one syndicate, that is a foreign corporation, it is the sole member, right? The sole member. All right. This will help me one, one last point that does the syndicate? Can the syndicate have a different citizenship of a foreign jurisdiction than its sole member? I don't see how. Pardon me? I don't see how. Yes. So it's not separately organized under any foreign jurisdictions laws. Is that what that, you know, that that's really a question of foreign law that probably better address to Mr. Fields, but okay. I don't think so. Okay. Going back to the, to the substance of our claims, that's a Palm Beach, it's somewhat different, because we don't believe there was any virus in inhabiting our premises. Our, our claim is that we suffered a direct physical loss because we were unable to use the property for its intended purpose. And under Florida law, that constitutes a direct physical loss. There was some discussion before about Azalea. Azalea, in Azalea, they suffered both damage and loss. The, the necessary change had to scrape the bacteria off. That was the damage, but the inability for it to function, it would, they suffered a loss. Now quickly, I'm running out of time. Our point is, the other point is, all we have to do is to present one reasonable interpretation of the policy. We presented a reasonable interpretation of the policy. We don't need to produce the only one, so long as it, we have provided. This is a question of law, isn't it? It, it is a question of law, but we have provided. And the ordinary, and the ordinary meaning controls. Correct. And we have provided the ordinary meaning for loss includes the inability to use the property. And under Florida law, loss has been interpreted as a loss of value. And so, and a property that you can't use it like you could before, you can't use it for its intended purpose. That is a diminution in value under Florida law. Okay. I think we understand your argument. Mr. Fields? Thank you, Your Honor. Do you wish me to address the issues related to jurisdiction to start with, Your Honor? Was there any, so as I understood it, can the syndicate be organized under a foreign state's laws that somehow would, somehow it'd be different from its sole member? The syndicate is going to be, the syndicates are actually not legal entities. Okay. They come together for the purposes of writing insurance. They come together for the purposes of writing insurance. Okay. This date is the 1600s when Lloyd started. The actual entity that is insuring in this case is Britt Underwriting Limited as the leader. And it's a sole member of 2987, Syndicate 2987. Okay. But, but Britt Underwriting Limited is the entity that insures this particular risk. If we go back, Your Honor, there's a case, the Corfield case out of the Fifth Circuit. In this court's case, Austin Schwinn. Syndicate 2987 or whatever the number is, it isn't organized under a foreign state's jurisdiction, right? Syndicate 2987 is just a way of referring to Britt Underwriting Limited, which is a UK citizen. Okay. All right. I think I understand. And you agree then with Mr. Taylor too, that, that the provision of the Class Action Fairness Act that is a D10 that I quoted earlier doesn't, doesn't abrogate what would be the ordinary rule for determining the citizenship of an unincorporated association from a foreign state. I agree with that, Your Honor. And if there's any, if there's any defendant that is a citizen of a foreign state under Catholic, you've got to have, still have minimal diversity. And thus you would look to their citizenship, that being a, in this case, United Kingdom. Okay. Thank you. Thank you, Your Honor. And as I start, my name is Paul Fields and I am counsel for the defendants, certain underwriters at Lloyd's London and the SA Palm Appeal. I'm also counsel for Iron Shore Specialty in the RTG Furniture Appeal. I've been designated to speak on behalf of the Appalese along with the Virginia Sites and Assembly Firm, and she is going to address some of the specific issues that are involved in the Emerald Coast Appeal. I believe Your Honor has actually addressed the main issue involved in this case. Property insurance policies under Blackletter Florida law ensure against the direct physical loss of or damage to property and is recognized and required under, under Florida law, under Blackletter Florida law. This means there must be an actual direct physical loss of property, actual direct physical damage to property in order to recover. Mr. Fields, do we, the same question that I asked Mr. Barr, do we wait for the Third District Court of Appeal in Florida to issue a decision in the Commodore case or should we wait? Your Honor, I don't think there's a reason to wait and the reason I would, I would say there's no reason to wait is because the law has been uniform across the country. I mean, let me play devil's advocate with you. One reason to wait is that if we come out in a way that ends up different from what the Third DCA has decreed, that may create an issue, at least for a period of time until the issue gets sorted out, until we get a second case or until the Florida Third DCA opinion goes up to the Florida Supreme Court or until some other DCA joins in one way or another. Your Honor, that, while that is a, that is a possibility, I would, I would suggest that this the ascent hospitality matter and all the other courts across the country that have looked at this issue have not seen a reason to wait. There have been 20 federal appellate courts that have looked at this exact issue, 20. Every circuit has addressed this issue except for the first, the third, and the fourth. The remaining circuits have addressed the issue with the 20 20 different opinions. There have been no dissents in any of those opinions. They've all come out the same way, haven't they? They've all come out the same way, Judge Pryor, and they have... Granted that they've been under the laws of various states, right? They've been under the laws of various states. Ascent hospitality, which this court decided was a case from Alabama, under New York. Gilreath was from Marietta, where I grew up, and it was Georgia law. But if we look at, say, for example, the courts in Ohio, and there have been several courts in the Sixth Circuit, in the DeSantos opinion, which has decided issues relative to direct physical loss or damage. And right today, as we sit here, the Ohio Supreme Court, I think at this exact time, is hearing opinion on the, is hearing an argument on this issue. But the Sixth Circuit didn't see the weight on this opinion. I would note that there have been 39 federal district courts in the state of Florida that have issued decisions. They have been unanimous. They have all found that there is no direct physical loss or damage to property. So, you know, to answer Judge Jordan's question... Of course, and I guess one problem, too, is that tells us that if we start waiting on a particular court ruling, we could be waiting a long time, because there are a lot of courts ruling on this. Your Honor, there are a lot of courts ruling on this. I believe Your Honor has, this court has several other appeals that are still pending on this exact issue that are scheduled to be argued in the upcoming, in the future. And I would submit to the panel that seldom has there been any issue that has been litigated as frequently in such a short amount of time that has resulted in such a unanimous opinion. I mean, if you think of the 20 different appellate decisions, if we assume that there's not overlap in the judges, that's 60 different judges, no dissents, no concurrences. 39 decisions from the Florida district courts, no one going the that there's a reason to wait. There's a reason to wait, because Ninth Circuit didn't wait with California, etc. So as we go on, I would argue the issue's right. I would argue that the decisions that were done by the, that the decisions that were issued in these three cases are appropriate. I would like to note, just for the, for the panel's edification and knowledge, that we have three appeals here, but they are slightly different. In the S.A. Palm appeal, they do not allege at all that there was any COVID-19 on the premises. This is a class action case, and its claims are solely based on the argument that these stay-at-home orders, which we know were issued to slow the spread back in March of 2020, somehow resulted in a loss of use. But your argument would be that even if there was contamination of property by the virus that could be clean, it still would be excluded, right? It wouldn't be covered as a direct physical loss or property damage. It would not be covered, Your Honor. I would note for the court's reference the Mama Joe's decision issued by this court in 2020. It dealt with a situation that is very, very, very similar, and in fact, I think is now controlling. If you look at Mama Joe's, there was a restaurant outside of Miami, Florida. There was road construction that was going outside of the restaurant. Dust got into the restaurant, and it had to be cleaned. And this court found that there was no requirement. There was no coverage. It found that merely cleaning a structure is not a loss, which is direct and physical. You can just go in and wipe it off. So yes, Your Honor, even if there was COVID-19 on the premises, all you would have to do over time, it would just dissipate. Or if not, you could go in and clean it off. And in fact, Mr. Fields, there are a couple of cases, very few of them that go the other way, that go against the majority of them. And I'd like to give you the opportunity to tell me why you think that those few cases are wrongly decided. As Chief Judge Pryor noted, the great majority of these federal cases all are interpreting the laws of different states with regards to insurance. But that cuts both ways for both parties. So you've got the case out of Virginia, the case called Elegant Massage, which sort of interprets Virginia law in a very similar policy in a way like Mr. Lynn did. So tell me why you think Elegant Massage is wrong. Elegant Massage was wrongfully decided. There's actually been a pellet activity that occurred in Elegant Massage after it was issued. And there was, I believe it was a writ that went to the what had been going on in Elegant Massage. It is an outlier. It has not been addressed by the Fourth Circuit. There are Virginia cases. In fact, I believe I saw one yesterday, and I apologize to the panel for not having the site right at me. Since it was a Virginia case, I didn't bring it in, but it went the other way. But I believe that there was a writ that occurred in Elegant Massage to the Fourth Circuit, and that particular writ was issued and directed the district court judge to take some action inconsistent with his prior ruling. So I think Elegant Massage is totally an outlier and will be ultimately, I believe, reversible. So it's a district court ruling. It interprets the same kind of policy language, direct physical loss or property damage in the way that Mr. Lynn argued. Is that right? I believe I haven't read the decision in some time because it's against Virginia. But yes, there were several decisions that were issued early days that may have gone the other way. There's another one, 417 Studio out of Missouri, and there was one Henderson Road, which was out of Ohio. Are these all trial court rulings? They're all trial court rulings, and I would argue that 417 has effectively been reversed by the Eighth Circuit when it issued a decision to oral surgeons, which went the other way. The Henderson Road, I believe it was Henderson Road Podiatry, I could be wrong. It could be a dentistry case. But Henderson Road was a decision by, I think it's Judge Posner, out of the Sixth Circuit, out of Ohio. The Sixth Circuit went in and went the other way, and now I believe they got three or four decisions that have gone the other way and actually issued a directive to the district court judge in that case to reconsider his decision in light of their prior rulings, and he reversed himself or essentially changed his opinion. So while there are a few decisions that have been out there that go the other way, Judge Jordan, I would say if we look deeply at all of those decisions, we will see that most of the appellate courts that have addressed it effectively have overruled those decisions. But no, is it your contention then that there's no appellate court that has ruled contrary to your argument to the extent that there are any rulings, they're all from trial courts, and their reasoning has been called into question by later events. But the main thing is they're all trial courts. They're all trial courts. There are 20 circuit appellate courts, and in addition to those, there are five state appellate courts. There is one from Indiana, California, the ends by the sea decision, two that occurred in Ohio, and one that came down last week, a week before last, the Galavantes decision out of Michigan. All, with all of that, and all found that COVID-19 under property policies has no coverage because there is no direct physical loss of or damage to property. Mr. Fields, this doesn't go to your overall point, but I just looked on Westlaw and the writ or issue you were talking about with the Fourth Circuit in elegant massage dealt with a later class certification order. Yeah, I believe that's right, Your Honor. Yeah, it doesn't detract from your argument, but it didn't affect the earlier policy interpretation decision issued by the district court in that case. Right. That issue has not been addressed by the Fourth Circuit, and I would note for Judge Jordan that the only three circuits that have yet to address this issue are the First Circuit, the Third Circuit, and the Fourth Circuit, are the only federal circuits which have not weighed in on the direct physical loss of or damage to property requirement. Yes, Your Honor, I remember that there was a writ that came up, but it did bring into question, at least in my mind, that they took the extraordinary efforts of issuing the writ relative to the class. Your Honor, I would also note just briefly in the short amount of time that I have left, and I will leave some time for Ms. Seitz, but we have also several exclusions which are applicable and could apply to this situation. There is a micro-organism exclusion in the Crest Hotel owner case, 20 Federal 4th 303, decided December 9th of 2021, and it found that the micro-organism exclusion is enforceable in the COVID-19 context and excludes coverage for such a situation. I would say that this case is consistent with the Robinson v. Liberty Mutual Insurance Company case decided by the 11th Circuit. That case dealt with spiders and whether spiders were insects or vermin, and it found that they would fall under that category. There is also total mold, mildew, or other fungi exclusion, which specifically references virus and excludes coverage as well, and in addition, in the SA matter, there is a contamination exclusion, which would also appear to apply. In the RTG furniture matter, there is also a pollution exclusion, which again specifically references virus. Now, none of the three district courts in this matter, and we have them from the Northern District, the Middle District, and the Southern District, they didn't need to reach these exclusions because they ruled on the direct physical loss over damaged property, but it is if there are no further questions, I will sit down and see the rest of my time to Ms. Sykes. Great. Ms. Sykes. Ms. Sykes, you're on mute. You're still on mute. Okay. May it please the court. Virginia Sykes for Aspen, Appelli, and the Emerald Coast Appeal. This appeal presents several issues not present in the other consolidated cases, and first I'll address spoilage. This endorsement covers food spoilage when it results from temperature or humidity changes or certain mechanical equipment failures. Emerald says that that's only part of the causation that is covered, but in fact if you look at the policy language on page 63, it says this coverage is extended, quote, but only with respect to coverage provided by this endorsement. We think that policy language restricts the causes to those enumerated in the endorsement, but in any event, even if the Emerald were correct and it extended to all covered causes, the policy defines covered cause of loss as, quote, direct physical loss, and that's in the appendix at 90, and Emerald has not shown that any of its spoiled food was caused by any direct physical loss if you look at the allegations in the complaint. The second issues I'd like to cover are those in the exclusions in the Aspen policy. After we brief this case. So if Ms. Sykes, if, again, just to try to wrap my head around that spoliation issue, if food was contaminated in some way, shape, or form by the virus, would you have direct physical loss? There's no allegation in the complaint, so I'm fighting the hypothetical a little bit that the food was, that they allege the food was contaminated. I'm not suggesting that's an allegation. I'm just trying to figure out how to analyze the spoliation clause. So no, I think the answer is no, because the causes of food spoliation that are covered are temperature, humidity changes resulting from mechanical equipment failures or power outages. So I don't think that COVID is a covered cause of loss there. If COVID were, had been alleged to be on the food, and if causes of loss go beyond those in the endorsement to direct physical loss, then I think you'd have, they would have an argument, but they haven't alleged that. And I don't think the endorsement extends beyond the causes specified in the endorsement itself in any event. Okay. Thank you. So sure. With respect to the- Ms. Sykes, your time has expired. Thank you. Mr. Lin, you've saved one minute. Thank you, Your Honor. I just have two points to make. The first is, none of the federal courts of appeals that have addressed this issue have addressed reading physical as describing and modifying the cause of the loss. And on page 25 of the brief in our case, they acknowledge that that is a reasonable reading of physical. They say that those cases, there are cases that involve a physical force or a condition on the property that affects its functionality. And we think that's consistent with Azalea. We think that's consistent with Western Fire and Hughes and the other cases. My second point, Your Honor, is that even if this court concludes that a tangible alteration is required, we pleaded that there was COVID-19 on the property, that it caused physical damage. And furthermore, we pleaded that there were orders from Broward County and other places where the executive branches recognized that COVID-19 causes physical damage. That's that paragraph 40 of our complaint. And we think that's enough on tangible alteration to survive a motion to dismiss. Thank you. Thank you, Mr. Barr. Two minutes. Thank you, Judge. Just addressing the miscite said we haven't alleged that COVID was on our perishable product. We did argue, we did allege in our complaint, our minute complaint, that COVID was present in and on the premises and on the physical property owned by Emerald Coast. So if that doesn't extend to the perishable product, then we should at least be given the chance to amend the complaint to more clearly indicate that it was on the perishable product and be more specific. Certainly shouldn't be a final order of dismissal. And the physical loss was the actual loss of the perishable product. If you look at the the the coverages available and the spoilage provision, as well as the exclusions, it makes it clear that you do not have to have a physical alteration of the property to have spoilage of perishable product. Again, mechanical breakdown is not a physical alteration to the property, neither is a power outage. It's not a physical alteration of the exclusions, as well. I also want to point out that our policy does not have a virus exclusion that Mr. Fields argued was present in the other policies. And we have the intangible coverages, as well, which were not addressed and I don't believe were addressed in the answer brief, as well, that clearly demonstrate that the coverage physical loss of and damage to extends beyond mere physical alteration of the property. In this case, if we haven't properly alleged a claim for spoilage or honors, we should be given a chance to do so. We haven't demonstrated through our pleadings that there is no way that we could ever allege a claim for spoilage. The spoilage claim is a limited claim under the policy. And we would ask the court to reverse the final order dismissal or give us an opportunity to amend the complaint to properly allege the claim. Thank you, Mr. Barr. Mr. Taylor. Your honors, all of the cases that Mr. Fields was talking about are all federal cases. There's the law in this on COVID business interruption losses has developed largely in the federal courts. And it's turned out to kind of develop a lot like kudzu, in that it's grown out of control. It's taken over everything. And it's obscured what the is before, you've got a bunch of federal cases, which is basically created federal common law, that loss or damage requires damage. And if you were if you apply the basic rules of insurance policy interpretation, word separated by or have to be different things. Loss is has to be something different than damage. If it's direct physical loss or damage, you can't read those phrases consistently with the basic rules of insurance policy interpret the word or introduces what is effectively a synonym. Not maybe if you're interpreting. No, well, if you get into a point, my point, Mr. Taylor is, they don't have to be mutually exclusive. There can be if not total overlap, at least substantial. No, that's just that's just an incorrect reading of the law. They have there has to be something plenty of wasn't. And there's, there's plenty of law that says the opposite also, which, you know, if that's so you're getting into, you know, is there two reasonable readings of this? If this language, you can't, how can you separate? Say loss or damage means damage without making one of those words redundant. I'm out of time. If the court has any more questions. No, I think we have your case, Mr. Taylor. Thank you.